AUSAs Ashley C. Nicolas, Courtney Heavey, and Joseph Rosenberg

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | **24 MAG 668** |
| UNITED STATES OF AMERICA<br><br>    v.<br><br>IVAN COLLADO,<br><br>                    Defendant. | <u>SEALED COMPLAINT</u><br><br>Violations of 18 U.S.C. §§ 1201(a)(1),<br>(c), (d), and 2.<br><br>COUNTY OF OFFENSE:<br>NEW YORK and BRONX |

SOUTHERN DISTRICT OF NEW YORK, ss.:

COLIN HIGGINS, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD"), and charges as follows:

### COUNT ONE
### (Conspiracy to Commit Kidnapping)

1. From at least on or about November 23, 2023 through at least on or about November 27, 2023, in the Southern District of New York and elsewhere, IVAN COLLADO, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to kidnap Raymond Resto, a/k/a "Sugar Hill Tone" (the "Victim"), in violation of Title 18, United States Code, Section 1201(a)(1).

2. It was a part and an object of the conspiracy that IVAN COLLADO, the defendant, and others known and unknown, would and did knowingly and unlawfully seize, confine, inveigle, decoy, kidnap, abduct, and carry away, and hold for ransom and reward and otherwise the Victim, and the Victim would be and was willfully transported in interstate and foreign commerce, and COLLADO would and did travel in interstate and foreign commerce and use the mail and a means, facility, and instrumentality of interstate and foreign commerce, to wit, a cellphone, email account, and tracking device, in committing and in furtherance of committing the offense, in violation of Title 18, United States Code, Section 1201(a)(1), resulting in death, to wit, COLLADO agreed with others to kidnap the Victim from a parking lot in the Bronx, New York, resulting in the Victim's death.

Overt Acts

3. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

   a. On or about November 25, 2023, a cellphone associated with IVAN COLLADO, the defendant, and subscribed to by an email address believed to be used by a coconspirator ("CC-1") was identified as the phone number for the registrant of a car tracking device (the "Tracking Device") that was used to facilitate the Victim's kidnapping.

    b. On or about November 26, 2023, COLLADO and CC-1 conducted surveillance of the Victim's home in the Bronx, New York.

    c. On or about November 26, 2023, COLLADO oversaw an unidentified co-conspirator ("CC-2") install the Tracking Device on the Victim's vehicle, which was parked in an enclosed retail parking lot in the Bronx, New York (the "Parking Lot").

    d. On or about November 26, 2023, three individuals ("CC-3, CC-4, and CC-5," or the "Kidnappers") confronted the Victim in the Parking Lot and kidnapped the Victim by stopping him and using force to try to drag him into their car.

    e. On or about November 26, 2023, during the kidnapping, the Kidnappers shot and killed the Victim in the Parking Lot.

(Title 18, United States Code, Section 1201(c).)

## COUNT TWO
**(Kidnapping Resulting in Death)**

  4. On or about November 26, 2023, in the Southern District of New York and elsewhere, IVAN COLLADO, the defendant, knowingly and unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away and held for ransom and reward and otherwise a person (the "Victim"), and the Victim was willfully transported in interstate and foreign commerce, and COLLADO traveled in interstate and foreign commerce and used the mail and a means, facility, and instrumentality of interstate and foreign commerce, to wit, a cellphone, email account, and tracking device, in committing and in furtherance of committing the offense, and attempted, aided and abetted the same, resulting in death, to wit, COLLADO aided and abetted the kidnapping of the Victim, from a parking lot in the Bronx, New York, resulting in the Victim's death.

(Title 18, United States Code, Sections 1201(a)(1) and (d), and 2.)

The bases for my knowledge of the foregoing charges are, in part, as follows:

  5. I am a Detective with the NYPD and have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

  6. Based on my involvement in the investigation, I have learned that, on or about November 26, 2023, three unidentified individuals (the "Kidnappers") — acting in connection with IVAN COLLADO, the defendant — kidnapped Raymond Resto, a/k/a "Sugar Hill Tone" (the "Victim") from the Parking Lot in the Bronx, New York, causing the Victim's death.

7. From my involvement in the investigation, including my review of records, including records regarding the location of the Tracking Device, my conversations with witnesses, and my review of surveillance video footage and license plate reader data, I have learned, among other things, the following:

    a. On or about November 25, 2023, an individual (the "Individual") activated a car tracking device (the "Tracking Device") using a particular email address (the "Email Address") and a phone number ending in 1246, which was subscribed to by an email address believed to be used by CC-1 (the "Activation Phone Number"). When registering the Tracking Device, the Individual used the name "Raymond Resto," the name of the Victim, and created the username "sugarhill," which is the Victim's alias. The unit number for the Tracking Device was 8882275019. The Individual purchased the Tracking Device using a particular credit card (the "Credit Card"). Based on my conversations with the owner of the Credit Card, I have learned that the owner of the Credit Card did not authorize anyone to use the Credit Card to purchase the Tracking Device. That is, the Tracking Device was purchased with the use of a stolen identity.

    b. On or about November 25, 2023, at approximately 11:36:07 PM, the Tracking Device recorded its first location: 140-74 Burden Crescent, Queens, New York (the "Burden Crescent Address"). At the same time, two individuals matching the physical build and characteristics of IVAN COLLADO, the defendant, and CC-1, entered a dark colored crossover style SUV (the "SUV") that was parked in front of the Burden Crescent Address and left the area. I am familiar with the physical characteristics of IVAN COLLADO, the defendant, from having reviewed photographs from COLLADO's criminal history report. I am also familiar with the physical characteristics of CC-1 from having reviewed a photograph of CC-1 that was provided by an Eastern District of New York Probation Officer who has interacted with CC-1 on numerous occasions, and having reviewed surveillance camera footage during the course of this investigation.

    c. Based on my review of the location data for the Tracking Device and surveillance video capturing the SUV as it left the Burden Crescent Address, I learned that, between on or about November 25, 2023, at approximately 11:36 PM and on or about November 26, 2023, at approximately 12:03 AM, the Tracking Device traveled along the same path as the SUV. For this reason, I believe that the Tracking Device was traveling inside the SUV with COLLADO and CC-1.

    d. On or about November 26, 2023, at approximately 12:03 AM, the SUV returned to the Burden Crescent Address. Upon arrival, the two individuals, who appear to have the same physical build and characteristics as COLLADO and CC-1, exited the SUV and briefly entered a home near the Burden Crescent Address (the "Collado Home"). At approximately 12:15 AM, the same two individuals exited the Collado Home and entered another vehicle, a gray Nissan Rogue (the "Nissan").

    e. On or about November 26, 2023, beginning at approximately 12:15 AM, the Tracking Device traveled along the same path as the Nissan, as corroborated by surveillance video and tracking data. That is, the Tracking Device was now traveling inside the Nissan.

    f. On or about November 26, 2023, at approximately 1:03 AM, the Tracking Device and the Nissan arrived in the vicinity of an address in the Bronx, New York. Based on my

visit to the Bronx address, during which I spoke to a resident, I believe the Bronx address to be the Victim's home address (the "Victim's Home"). The Nissan — occupied by COLLADO and CC-1 — and the Tracking Device remained in the vicinity of the Victim's Home for approximately two hours. Based on my training and experience, I believe that the Nissan remained in the vicinity of the Victim's Home because its occupants were conducting surveillance of the Victim.

        g.      At approximately 3:00 AM, the Victim and his wife (the "Wife") exited the Victim's Home and drove a Honda (the "Honda") to an enclosed retail parking lot in the Bronx, New York (the "Parking Lot"). The Nissan followed.

        h.      At approximately 3:04:06 AM, the Nissan — occupied by COLLADO and CC-1 — and the Honda — occupied by the Victim and the Wife — arrived in the vicinity of the Parking Lot. At the same time, the Tracking Device recorded its location in the vicinity of the Parking Lot. The Nissan and the Tracking Device then traveled briefly into Manhattan. The Victim and the Wife left the Honda in the corner of the enclosed parking area. The Victim and the Wife then left the Parking Lot using a car service, leaving the Honda behind unoccupied.

        i.      Approximately an hour after the Victim left the Parking Lot, at approximately 4:04:55 AM, the Nissan returned to the Parking Lot, followed closely by a dark colored BMW with a body shape consistent with an X5 or X6 model (the "BMW"). The BMW pulled up next to the unoccupied Honda, while the Nissan positioned itself outside the Parking Lot, where COLLADO and CC-1 could oversee the actions of the driver of the BMW.

        j.      Approximately one or two minutes after arriving at the Parking Lot, an individual ("CC-2") exited the BMW from the driver's side and bent down next to the Honda. CC-2 then reentered the BMW and departed. The Nissan followed the BMW.

        k.      Thereafter, the location data for the Tracking Device indicated that the device did not exit the Parking Lot when the Nissan did, but instead, remained stationary. For this reason, I believe that CC-2 placed the Tracking Device on the Honda. In addition, as further described below, the Tracking Device subsequently recorded data consistent with the Honda's later movement.

        8.      Based on my review of records provided by the manufacturer of the Tracking Device, I know that the location data associated with it would have been transmitted to either: 1) the Activation Phone Number, which, as further described below, (i) COLLADO identified as his contact number during a 911 call he made on or about November 23, 2023, (ii) to the number was also subscribed to an email address believed to be used by CC-1, and (iii) was identified as the phone number for the registrant of the Tracking Device, or 2) the Email Address, which was identified as the email address for the registrant of the Tracking Device. Further, based on the subscription plan, the Tracking Device transmitted its location approximately once per minute. That is, the owner of the Tracking Device — COLLADO — would have received the location of the Honda once per minute once the Tracking Device was installed on the Honda.

        9.      Based on my review of surveillance video, information from the Tracking Device, and law enforcement reports, I know, among other things, the following:

4

   a. On or about November 26, 2023, at approximately 6:01 PM, the Victim and the Wife returned to the Parking Lot and departed in the Honda, wherein they traveled to a shopping center outside New York City. In or about the time that the Honda departed, the Tracking Device similarly reflected that the device left the Parking Lot and headed to a location outside New York City. At approximately 11:45 PM — the evening after the Tracking Device was installed — the Victim and the Wife returned to the Parking Lot and parked the Honda in the same location in the corner of the Parking Lot where they had picked the car up earlier that same day. The Victim and the Wife exited the Honda and started walking towards a cab that was waiting for them (the "Cab").

   b. At approximately 11:49 PM, just four minutes after the Victim and the Wife arrived at the Parking Lot, the BMW entered the Parking Lot and pulled in front of the Victim and the Wife. Two individuals ("CC-3" and "CC-4") exited the BMW and attacked the Victim. CC-3 and CC-4 tried to force the Victim into the backseat of the BMW. While CC-3 and CC-4 attempted to force the Victim into the BMW, a third individual ("CC-5," and with CC-3 and CC-4, the "Kidnappers") exited the BMW from the driver's seat. The Kidnappers were all wearing dark clothing and gloves.

   c. After struggling (and failing) to force the Victim into the BMW, one of the Kidnappers began shooting the Victim at close range. The Victim struggled to escape while the other Kidnappers also began to shoot at the Victim. Ultimately, the Victim was struck at least four times, including at least once in the face. The Victim was later pronounced dead at a local hospital.

   d. After the shooting, the Kidnappers entered the BMW, and fled the Parking Lot at approximately 11:53 PM.

   e. The Cab followed the BMW briefly. The driver of the Cab reported to law enforcement, in sum and substance, that the BMW bore a temporary Georgia license plate.

   f. At approximately 12:30 AM, on or about November 27, 2023, COLLADO — driving the Nissan — returned to the Burden Crescent Address, where he was captured on surveillance video exiting the Nissan and leaving the area on foot. Approximately 20 minutes later, at 12:50 AM, COLLADO was dropped back off in another vehicle at the Burden Crescent Address and entered the Collado Home.

  10. Based on my review of NYPD reports and my discussions with other NYPD officers, I have learned that on or about November 27, 2023, NYPD investigators thoroughly searched the Honda pursuant to a consent to search, and recovered a location tracking device. The unit number associated with the recovered tracking device was 8882275019, which is the same as the device number of the tracking device described *supra* ¶ 5(a). That is, the recovered tracking device is the Tracking Device.

  11. Based on my review of 911 call data, as well as NYPD reports, NYPD officers' body camera video, and surveillance video captured from the vicinity of the Burden Crescent Address, I have learned, among other things, the following about a report made by IVAN COLLADO, the defendant, in advance of the kidnapping:

5

    a. On or about November 23, 2023, at approximately 11:50 PM, IVAN COLLADO, the defendant, made two 911 calls to, in sum and substance, report the presence of a suspicious vehicle (the "911 Calls") in the vicinity of the Burden Crescent Address. COLLADO described the suspicious vehicle as a navy-blue BMW X5 or X6 with a temporary license plate.

    b. During the 911 Calls, COLLADO identified himself as "Ivan Collado" and gave the Activation Phone Number as his callback number.

    c. At approximately the time of the 911 Calls, an individual with the physical build and characteristics of COLLADO, approached a car with a body shape consistent with a BMW X5, from the direction of the Burden Crescent Address. COLLADO then entered the car and moved it to a position outside the view of the surveillance camera. On or about November 24, 2023, at approximately 1:00 AM, NYPD officers responded to the Burden Crescent Address and contacted COLLADO, using one of the numbers that COLLADO used during the 911 Calls, to ascertain additional details regarding his report. COLLADO informed the officers, in sum and substance, that the suspicious BMW with temporary plates had moved since COLLADO called 911 and that COLLADO was following the suspicious BMW, which was travelling in the vicinity of 139th Street and 86th Avenue.

    d. Shortly thereafter, the officers identified a vehicle that matched COLLADO's description near the location where COLLADO had just reported seeing it, *i.e.*, near the intersection of 84th Drive and 85th Road. The officers reported that the vehicle had a particular temporary Georgia license plate, consistent with a description that would later be provided by the Cab driver on the night the Victim was murdered (the "Georgia BMW"). *See supra* ¶ 6(f).

  12. Based on my training and experience and my involvement in this investigation, I believe that the 911 Calls were an effort by COLLADO to dissociate himself from the BMW prior to the kidnapping. I believe this because (i) the BMW was parked in the immediate vicinity of COLLADO's residence prior to the 911 Calls; (ii) at or about the time of the 911 Calls an individual with the physical build and characteristics of COLLADO, whom I believe to have been COLLADO, entered the BMW, and moved it out of the view of the surveillance camera; (iii) COLLADO was traveling in the Nissan with the Tracking Device immediately prior to its installation by CC-2, who was traveling in what appears to have been the BMW; (iv) COLLADO oversaw the installation of the Tracking Device on the Victim's Honda by CC-2, who was traveling in what appears to have been the BMW; and (v) the Kidnappers thereafter used what appears to have been the BMW to commit the kidnapping and murder. I submit that by making a false report to 911 prior to the kidnapping, COLLADO was attempting to distance himself from the car that was to be used in furtherance of the kidnapping.

  13. Based on my review of documents in the NYPD database as well as my conversations with individuals familiar with the Burden Crescent Address, my observations during surveillance, and my conversations with a Probation Officer for the Eastern District of New York, I have learned, among other things, that IVAN COLLADO, the defendant, resides in the Collado Home with CC-1 (the "Collado Home"). The Collado Home is in the immediate vicinity of the Burden Crescent Address.

14. Based on my review of documents from the Department of Motor Vehicles (the "DMV"), I have learned, among other things, that the Nissan is registered to IVAN COLLADO, the defendant, at the Collado Home.

15. Based on my involvement in this investigation, I have learned that, on or about December 18, 2023, NYPD officers seized the Georgia BMW in Queens, New York.

16. Based on my review of records, I have learned, among other things, the following:

   a. On or about November 27, 2023, the Tracking Device was deactivated.

   b. On or about November 27, 2023, the Email Address was deactivated.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of IVAN COLLADO, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

                *Colin Higgins (by VF with permission)*
                COLIN HIGGINS
                Detective, NYPD

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 13th day of February 2024.

_____
THE HONORABLE VALERIE FIGUEREDO
United States Magistrate Judge
Southern District of New York